IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DOUGLAS R. PAXTON,**

    **Plaintiff,**

                                    Civil Action 2:19-cv-1450
                                    Judge James L. Graham
    v.                            Chief Magistrate Judge Elizabeth P. Deavers

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Douglas R. Paxton ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Social Security Disability Insurance benefits ("SSDI") and Supplemental Security Income benefits ("SSI").  This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 12), the Commissioner's Memorandum in Opposition (ECF No. 18), and the administrative record (ECF No. 7).  Plaintiff did not file a Reply.  For the following reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

        **I.**        **BACKGROUND**

Plaintiff applied for disability benefits on February 17, 2015, and supplemental security income on March 2, 2015.  (R. at 217, 219.)  Plaintiff's claim was denied initially and upon reconsideration.  (R. at 73-74; 103-104.)  Upon request, a hearing was held on January 24, 2018,

in which Plaintiff, represented by counsel, appeared and testified. (R. at 35–72.) A vocational expert also appeared and testified at the hearing. (*Id.*) On May 21, 2018, Administrative Law Judge Matthew Winfrey ("the ALJ") issued a decision finding that Plaintiff was not disabled at any time after November 2, 2014, the alleged onset date. (R. at 12-34.) On February 15, 2019, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1–6.) Plaintiff then timely commenced the instant action. (ECF No. 1.)

## II.     HEARING TESTIMONY

### A. Plaintiff's Testimony

At the January 2018 administrative hearing, Plaintiff testified that he was married and lived with his wife and three sons. (R. at 43.) He stated that his family's income came from his wife's job as a paralegal and that his family received public benefits including food stamps and medical. (*Id.*) He testified that he had a driver's license but drove "as least as possible." (R. at 43-44.)

Plaintiff stated that his last job was as a part-time paper route deliverer for the Columbus Dispatch and the last time he worked was "probably to maybe 2011." (R. at 44.) He testified that he stopped because he "wasn't physically capable to continue the job." (*Id.*) He explained that he had previously worked full time as a gas fitter for Design Plumbing where he was required to carry tools and materials ranging from 15 to 50 pounds. (R. at 44-45.) He testified that he left that job during the recession in 2008 when he was laid off. (*Id.*) Prior to working for Design, he worked for another plumbing company as a gas fitter beginning in 2004 but left that job for better pay at Design. (R. at 46.)

When asked by the ALJ what prevented him from working, Plaintiff testified that he would "have to say honestly it is the lack of motivation to learn a new position." (R. at 47.) Plaintiff stated that he has pain in his low back that becomes worse with exercising. (R. at 47-48.) He stated that he cannot walk for long when he is in pain and his legs are swollen. (R. at 48.) He explained that he used to hunt but now found it hard to walk or sit in the woods because it takes him so long to prepare and "it's a big hassle." (R. at 48-49.) He also stated that his shoulders were sore when he exercised. (R. at 49.)

Plaintiff testified that he was seeing a counselor every other week now but had seen him weekly for the first two years. (R. at 49.) He said he took Wellbutrin and that this medication helped without any side effects. (R. at 49-50.) He also testified that, as he had progressed it no longer seemed to be helping so he had asked his doctor for something else. (R. at 50.) His doctor, Dr. Quinlan, had prescribed some herbal medicine but it was very expensive and he could "not accommodate that at the time." (*Id*.)

Plaintiff further testified that he went to the grocery store approximately twice a week and tried to get in and out as fast as he could because he did not want to deal with the "chaos." (R. at 50-51.) He also stated that he dealt with pain on a daily basis and if he felt too much pain he would not go to the grocery. (R. at 51.)

Plaintiff stated that he uses a sleep apnea machine almost every night and that "it has helped a lot." (R. at 51.) He stated that it is becoming more difficult for him to watch television and he cannot sit through a two-hour movie with his kids. (*Id*.) Plaintiff testified that his memory was not very good even though his depression had improved. (R. at 51-52.) Plaintiff further testified that he has a hard time focusing. (R. at 52.) Plaintiff also stated that he still smokes and smokes marijuana for his pain. (*Id*.)

The ALJ noted that Plaintiff was doing some things to try to help himself and asked Plaintiff about his martial arts classes. (R. at 53.) Plaintiff explained that he had been going to Taekwondo classes at least once a week for approximately the previous seven months and had had three testings. (*Id*.) Plaintiff stated that in 2015 he had had difficulty maintaining his personal hygiene. (R. at 54.) In response to the ALJ's questions regarding his daily activity, Plaintiff stated that he woke up and tried to get his sons ready for school. (*Id*.) He further testified that he tried to do the dishes, go to the grocery store and keep up with odd jobs like car maintenance and oil changes. (R. at 55.) He stated that he tried to have dinner ready for his sons when they got off the bus and worked around the crazy taekwondo schedule between him and his sons. (*Id*.) Plaintiff also testified that his family has a dog and that he helps take care of the required yard cleanup. (*Id*.)

In response to questions from his counsel regarding his irritability and temper, Plaintiff explained that when he was in pain it was hard for him to keep his composure. (R. 56.) He stated that sometimes he needs to remove himself from the situation. (R. 57.) He explained that, on a daily basis, however, he becomes irritable once or twice a day and he tries to control it. (*Id*.) Counsel also asked Plaintiff about his back and extremity pain and his leg swelling. (R. at 58.) Plaintiff testified that his doctor had advised him to elevate and keep off his feet when he experienced swelling but that that was hard to do with three boys. (*Id*.) He further testified that it takes him longer to do household chores because he needs to take breaks to elevate his leg. (*Id*.) Plaintiff explained that, if he stays on his feet too long, he suffers tingling and loss of feeling and would not be able to walk. (*Id*.) With respect to counsel's questions regarding his memory and concentration, Plaintiff stated that he can sometimes lose the process of what he is doing even on an easy task. (R. at 59.)

When counsel inquired as to Plaintiff's mental and emotional health, Plaintiff explained that he loved being in the woods and was surprised at how hard it became for him to be there. (R. at 59-60.) However, he stated that it had gotten easier in the last two years and that it was something he wanted to able to share with his sons. (R. at 60.)

Finally, Plaintiff explained that he resisted applying for benefits because he did not want to deal with anything. (R. at 61.) He stated that at the time of his application he was secluded at home and did not even drive his sons to taekwondo. (*Id.*) After a few months of counseling, however, Plaintiff explained that it was easier for him to get out and do things with his kids. (R. at 62.)

B. **Vocational Expert Testimony**

Carl Hartung testified as the vocational expert ("VE") at the January 2018 hearing. (R. at 63-67.) He characterized Plaintiff's previous job as a plumber. (R. at 63.) The ALJ proposed a series of hypotheticals regarding Plaintiff's residual functional capacity ("RFC") to the VE. (R. at 64-67.) First, the ALJ asked the VE to assume someone with Plaintiff's age, education and past job who is capable of working at the light exertional level range meaning that they "can lift 20 pounds – lift and carry 20 pounds occasionally, 10 pounds frequently; sit for up to six hours, but standing and walking for up to four hours" (R. at 64.) Further, they "can occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally stoop, kneel, crouch, and crawl." (*Id.*) Additionally, they "can up to frequently be exposed to workplace hazards such as unprotected heights or dangerous moving mechanical parts." (*Id.*) They "can tolerate up to frequent exposure to humidity and wetness; dust odors, fumes, and pulmonary irritants; and extreme heat and cold." (*Id.*) They are "limited to perform simple, routine, and repetitive tasks, but not at a production-rate pace, such as no assembly line work." (*Id.*) The individual "would

5

be limited to jobs where the job responsibilities are performed without close teamwork, tandem work, or over-the-shoulder supervision." (R. at 64-65.) Further, "they can tolerate no more than occasional changes in the workplace." (R. at 65.) The VE testified that this individual would not be able to do the Plaintiff's past work and that any other work would be considered at the sedentary level due to the lack of "ability to do a full definition of standing and walking for light physical demand requirement." (*Id.*)

Assuming the above hypothetical along with Plaintiff's educational and vocational background, the VE testified that, in the national economy, the hypothetical person could perform the jobs of addresser, document preparer, and inspector/spotter. (R. at 65.) The ALJ then asked the VE to assume that the hypothetical individual would be capable of standing and walking for two hours, balance frequently, could never be exposed to workplace hazards, such as unprotected heights or dangerous moving mechanical parts and would be off task five percent of the time. (R. at 66.) The VE testified that the hypothetical individual could perform the previously identified jobs. (*Id.*)

The ALJ then asked the VE to assume that the hypothetical individual is fully limited to the sedentary exertional range. (R. at 66.) The VE testified that the hypothetical individual could perform all the same work as in the previous hypothetical. (*Id.*) The ALJ then adjusted the hypothetical so that the individual would need to elevate the legs to waist height for two hours per day and would be off task approximately 15 percent of the day. (R. at 66-67.) The VE testified that none of those activities are permittable in the workplace. (R. at 67.)

The ALJ further revised the previous sedentary hypothetical to assume that the individual would have to work in isolation. (R. at 67.) The VE testified that such an individual would not be able to perform any work. (*Id.*)

6

### III. RELEVANT MEDICAL RECORDS

Plaintiff's statement of error relates only to the medical opinion offered by Dr. Robert Whitehead, a consultative examiner. Accordingly, the Court will confine its summary of the medical records to Dr. Whitehead's report. (R. at 364-372.)

Plaintiff was seen for a consultative examination by Dr. Whitehead on March 30, 2015, "with a chief complaint of low back pain." (R. at 364.) Plaintiff reported his medical history relating to his daily low back pain which he rated as an average severity level of 5/10 and daily bilateral knee pain which he rated at the same severity level. (*Id.*) Dr. Whitehead also noted a past medical history of depression, morbid obesity, low back pain, knee pain, and arthritis. (*Id.*) With respect to Plaintiff's visual acuity, Dr. Whitehead noted "[u]ncorrected far vision is 20/30 right eye and 20/30 left eye. Uncorrected near vision is 20/50 right eye and 20/40 left eye" and that Plaintiff was able to see how many fingers the examiner held up at five feet with both eyes. (R. at 365.) Upon physical examination, Dr. Whitehead noted that Plaintiff's cervical spine "shows painful but full range of motion with no midline tenderness or paravertebral tenderness. There are no palpable bony abnormalities and there is negative Spurling sign. There are no upper extremity focal deficits with strength testing or light touch sensation. DTR's were symmetric." (*Id.*) Dr. Whitehead found that Plaintiff's thoracic spine "shows normal range of motion and contour with no tenderness. There are no scoliotic changes, pigment changes or scars. There is no midline or paravertebral tenderness." (R. at 366.) With respect to Plaintiff's lumbar spine, Dr. Whitehead noted that it "shows diffuse tenderness, decreased range of motion. There are no scoliotic changes, pigment changes or scars. Straight leg raises are negative bilaterally. Deep tendon reflexes are absent in the knees and the Achilles bilaterally. He is able to briefly stand on his heels and toes. Waddell's signs are negative.

7

Sensation is altered from the knee distally in the right leg diffusely. Sensation is maintained on the left leg. Strength is maintained at 5/5 in the lower extremities." (*Id*.)  Dr. Whitehead's extremities exam found "no clubbing, cyanosis or edema. Bilateral shoulders show decreased painful range of motion with mild impingement. positive empty can test and positive Speed's test bilaterally. There is also tenderness bilaterally, right greater than left at the biceps tendon." (*Id*.) Further, based upon his extremities exam, Dr. Whitehead noted, "[t]he right knee exam shows positive effusion, medial joint line tenderness, peripatellar tenderness with range of motion as discussed with negative Lachman, negative anterior and posterior drawer. No varus or valgus laxity. The left knee shows no effusion, range of motion as documented with medial joint line tenderness. No soft tissue swelling or erythema or warmth to the touch" (*Id*.).  The results of the neurological exam Dr. Whitehead performed revealed that "cranial nerves II-XII are grossly intact. Sensation is altered as discussed above. Motor, see manual muscle testing sheet. The claimant is alert and oriented x 3. Cerebellar exam shows no abnormalities. Romberg is negative. Finger to nose pointing is normal. Toes are downgoing. Integument: Skin shows no rash or ulcerations" (*Id*.)

> Based on all of the above, Dr. Whitehead offered the following assessment:
>
> 1. Chronic low back pain likely related to degenerative disk disease with probable radiculopathy, possible spinal stenosis, although there was certainly no clonus or other suggestion of critical levels of spinal stenosis.
> 2. Degenerative joint disease of the right knee.
> 3. Left knee pain likely related to degenerative joint disease.
> 4. Bilateral shoulder pain likely rotator cuff tendinopathy and biceps tendinitis.

(*Id*.)  In conclusion, Dr. Whitehead stated that his examination of Plaintiff "would suggest this individual at the present time would have difficulty maintaining remunerative type employment." (R. at 367.)

## IV.    ADMINISTRATIVE DECISION

On May 21, 2018, the ALJ issued his decision. (R. at 12-34.) At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 2, 2014, the alleged onset date. (R. at 17.)

At step two, the ALJ concluded that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine; degenerative joint disease of the bilateral knees; morbid obesity; bilateral rotator cuff tendinopathy; and biceps tendinitis. (R. at 17.) The ALJ further found that the record did not document other severe impairments. (R. at 18.) Further, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926. (R. at 18.) The ALJ also found that the severity of the claimant's mental impairment did not meet or medically equal the criteria of listing 12.04 because it did not result in at least one extreme or two marked limitations in the relevant broad areas of functioning. (R. at 19.) Applying the "paragraph C"

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

criteria, the ALJ found that there was no indication that Plaintiff's mental disorder was "serious and persistent." (R. at 20.)

Before proceeding to Step Four, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he can lift and/or carry 20 pounds occasionally and 10 pounds frequently; he can sit for 6 hours out of an 8 hour workday; and he can stand and/or walk for 2 hours out of an 8 hour workday. He can occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; frequently balance; and occasionally stoop, kneel, crouch, and crawl. He can never be exposed to workplace hazards such as unprotected heights or dangerous moving mechanical parts. He can have frequent exposure to humidity, wetness, dust, odors, fumes, pulmonary irritants, and extreme heat and cold. Mentally, he is limited to perform simple, routine, and repetitive tasks, but not at a production rate pace (e.g. assembly line work). He can tolerate occasional interaction with supervisors and coworkers and no interaction with the public. He is limited to jobs where the job responsibilities are performed without close teamwork, tandem work, or over the shoulder supervision. He can tolerate no more than occasional changes in the workplace. He would he off-task 5% of the workday.

(R. at 20-21.)

When devising this RFC, the ALJ gave little weight to the GAF scores assigned by Plaintiff's counselor, Robert Lebo, noting that "an individual may be highly functioning at work but have lower scores due to other personal problems." (R. at 23-24.) The ALJ accorded "significant" weight to the opinions of the reviewing physician from the State Agency Division of Disability Determinations, stating that these opinions were supported by the bulk of the objective medical evidence. (R. at 24.) The ALJ gave some weight to the reviewing State agency psychological consultant opinions because they were "somewhat consistent with the broader medical record" but do not fully account for the noted improvement in Plaintiff's mental condition from counseling and medication. (R. at 24-25.) The opinion of consultative examiner Robert Whitehead, M.D., was given little weight because the ALJ found it vague, internally inconsistent, and

10

inconsistent with the broader medical record.  (R. at 25.)  The ALJ gave the opinion of psychological consultative examiner, Marc E.W. Miller, Ph.D., partial weight because it was vague but supported some difficulty Plaintiff experienced in each of the four areas of mental functioning. (*Id*.)   The November 2015 opinion of treating source Teresa Quinlin, M.D., was given little weight because it was inconsistent with the broader medical record, including Plaintiff's relatively normal physical examinations and his own testimony of his daily living activities.  (*Id*.)

At Step Four, the ALJ relied upon testimony provided by a Vocational Expert ("VE") at the hearing to find that Plaintiff's limitations preclude his ability to do past relevant work. (R. at 26.)  At Step Five, the ALJ relied again on the VE's testimony and concluded that through the date last insured, Plaintiff could perform other jobs that existed in significant numbers in the national economy such as an addresser, document preparer, and inspector spotter. (R. at 27.) Thus, he concluded that Plaintiff was not disabled under the Social Security Act. (*Id*.)

## V.     STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the

11

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.  ANALYSIS

Plaintiff puts forward one assignment of error. Plaintiff contends that the ALJ erred in failing to recontact consultative examiner, Dr. Whitehead, to obtain clarification of the reasons for his opinion that Plaintiff cannot maintain remunerative employment. (ECF No. 12, at p. 16.) In making this argument, Plaintiff relies on the Social Security Administration's Program Operations Manual System (POMS) guidelines. The guideline invoked by Plaintiff, POMS DI 24503.040(E)(1), sets forth the articulation requirement for "Evaluating a Statement on an Issue Reserved to the Commissioner." For claims filed prior to March 27, 2017, this guideline provides as follows:

> Never give a medical source's statement(s) on an issue reserved to the Commissioner controlling weight. The determination must explain the consideration given to the medical source's statement even if it is on an issue reserved to the Commissioner. If the evidence does not support a medical source's statement on an issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the statement from the case record, the adjudicator must make

12

every reasonable effort to recontact the source for clarification of the reasons for the statement.

Under Plaintiff's interpretation, if the two circumstances outlined in the final sentence are present, the ALJ is required to recontact the source of the opinion. Plaintiff contends, citing to *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 273 n.2 (6th Cir. 2010), that both circumstances are present with respect to Dr. Whitehead's opinion. Accordingly, Plaintiff asserts that the ALJ was required to recontact him for clarification. Plaintiff argues that the ALJ's failure to do so here constitutes harmful, reversible error.

In response, the Commissioner argues that the Sixth Circuit Court of Appeals has repeatedly rejected Plaintiff's argument, because "'an ALJ is required to recontact a treating physician only when the information received is inadequate to reach a determination on claimant's disability status, not where, as here, the ALJ rejects the limitations recommended by that physician.' *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 n.3 (6th Cir. 2009)." (ECF No. 18 at p. 4.) Further, the Commissioner asserts that the ALJ did not reject Dr. Whitehead's opinion because it was vague. Rather, the Commissioner explains, the ALJ rejected it because Dr. Whitehead did not indicate any specific limitations. Moreover, the Commissioner contends, in 2012, after *Ferguson* was decided, the mandatory duty to recontact a treating physician was eliminated. According to the Commissioner, the decision to recontact a treating source is now left to the ALJ's discretion. 20 C.F.R. § 404.1520b(b)(2)(i).[2]

To the extent that Plaintiff relies on the POMS guidelines as a basis for reversing the ALJ's decision, his argument fails as a matter of law. It is well-established that the POMS, as not subject to the formal rule-making procedure found in the Administrative Procedure Act, does

---

[2]This is the current regulation updated in March 2017. The prior version, effective at the time of Plaintiff's filing, was found at 20 C.F.R. § 404.1520b(c)(1).

not have the force of law. *See Davis v. Sec'y of Health & Human Servs.,* 867 F.2d 336, 340 (6th Cir. 1989) ("the POMS is a policy and procedure manual that employees of the Department of Health & Human Services use in evaluating Social Security claims and does not have the force and effect of law"). Accordingly, the POMS does not bind the Commissioner and failure to comply with the POMS is not a basis for reversing an ALJ's decision. *Burns ex rel. J.A.B. v. Comm'r of Soc. Sec.*, No. 1:13-CV-572, 2014 WL 5035351, at *6 (W.D. Mich. Oct. 8, 2014) ("The Social Security Administration's Program Operations Manual System (POMS) is an internal agency manual. Its guidelines have no legal force, and failure to follow the POMS is not legal error."); *see also Byers v. Comm'r,* No. 1:13–cv–339, 2014 WL 701597, at * 15 n.11 (W.D.Mich. Feb.24, 2014) ("[T]he POMS do not bind the Commissioner and failure to comply with the POMS is not a basis for reversing an ALJ's decision."); *Fisher v. Commissioner,* No. 1:09–cv–1096, 2011 WL 926865, at * 8 (W.D .Mich. Feb.28, 2011) (POMS guidelines have no legal force).

Plaintiff has not set forth any alternative authority for his proposition that the ALJ was required to recontact Dr. Whitehead. Nor could he. As the Commissioner contends, an ALJ is no longer required to recontact a medical source. The regulations in effect at the time of the ALJ's decision in this case indicate that if the record evidence is insufficient to determine disability, or if the ALJ cannot reach a conclusion on disability, in determining how to resolve the problem, the ALJ could recontact a medical source.[3] *Humphries v. Comm'r of Soc. Sec.*, No.

---

3 Specifically, the regulation provides as follows:

> We may recontact your medical source. We may choose not to seek additional evidence or clarification from a medical source if we know from experience that the source either cannot or will not provide the necessary evidence. If we obtain medical evidence over the telephone, we will send the telephone report to the source for review, signature, and return.

18-12123, 2019 WL 3244284, at *5 (E.D. Mich. June 25, 2019), *report and recommendation adopted sub nom. Humphries v. Comm'r of Soc. Sec. Admin.*, No. 18-CV-12123, 2019 WL 3229132 (E.D. Mich. July 18, 2019) (citing *Thomas v. Comm'r of Soc. Sec.*, 2019 WL 2063836, at *9 (E.D. Mich. Feb. 25, 2019)); *see also McBride v. Comm'r of Soc. Sec.*, No. 1:16-CV-708, 2017 WL 3393948, at *12 (S.D. Ohio Aug. 7, 2017), *report and recommendation adopted sub nom. McBride v. Comm'r of Soc. Sec.*, No. 1:16-CV-708, 2017 WL 4230516 (S.D. Ohio Sept. 25, 2017) (The regulations as amended specify that recontacting a treating physician or other medical source is permissive, not mandatory. 20 C.F.R. §§ 404.1520b(c)(1), 416.920b(c)(1)); *Weredick v. Comm'r of Soc. Sec.*, 2017 WL 4928649, at *8 (E.D. Mich. Aug. 4, 2017), *report and recommendation adopted*, 2017 WL 4112341 (E.D. Mich. Sept. 18, 2017) (an ALJ could re-contact a physician where the administrative record contains insufficient information to reach a disability decision;) *Hollis v. Comm'r of Soc. Sec.*, No. 13-13054, 2015 WL 357133, at *23 (E.D. Mich. Jan. 27, 2015) (ALJs now have discretion to decide whether to recontact);

The ALJ addressed Dr. Whitehead's opinion in this way:

---

20 C.F.R. § 404.1520b(b)(2)(i)

Further, at the time Plaintiff filed his claim in February 2015, the regulations directed to recontacting a physician indicated, in relevant part:

> We *may* recontact your treating physician, psychologist, or other medical source. We *may* choose not to seek additional evidence or clarification from a medical source if we know from experience that the source either cannot or will not provide the necessary evidence.

20 C.F.R. §§ 404.1520b(c)(1), 416.920b(c)(1) (emphasis added).

Finally, as recognized in *Ferguson*, prior to 2012, the requirement set forth in 20 C.F.R. § 404.1512(e) and 20 C.F.R. § 416.912(e), recognizing a duty to recontact, applied only in cases where the evidence from the treating physician was inadequate to determine disability and contained a conflict or ambiguity requiring clarification. *Ferguson*, 628 F.3d at 273.

15

> The opinion of consultative examiner Robert Whitehead, M.D. is given little weight (Ex. 5F). Dr. Whitehead opined that the claimant would have difficulty maintaining remunerative type employment. This opinion is vague and it is given little weight as it is both internally inconsistent with Dr. Whitehead's own examination findings which are normal as to strength and show no more than a limited range of motion in the lumbar spine and the shoulders. It is also not consistent with the broader medical record or the claimant's reported activities of daily living. Finally, it is an opinion on an issue reserved for the commissioner.

Plaintiff argues that the above findings indicate that the ALJ found that Dr. Whitehead's opinion was unclear. Plaintiff, however, does not argue that the record, as whole, is insufficient to make a disability determination. Moreover, even if that were Plaintiff's argument here, it would not be well-taken. The decision to recontact Dr. Whitehead, or any other medical source for that matter, would remain within the ALJ's discretion. Further, the ALJ's comprehensive opinion demonstrates that he carefully considered the entire record in this case; identified substantial evidence supporting the determination that Plaintiff was not disabled; and did not abuse his discretion is failing to recontact Dr. Whitehead.

In short, as Plaintiff characterizes his own argument, it is simply that the ALJ committed legal error by failing to follow the Agency's own rules and regulations. As set forth above, these regulations do not require an ALJ to recontact a medical source for further explanation. Accordingly, plaintiff's argument should be rejected. It is therefore **RECOMMENDED** that Plaintiff's contention of error based on the ALJ's failure to recontact Dr. Whitehead be **OVERRULED.**

## VII.   CONCLUSION

For the reasons stated above, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## VIII. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: June 5, 2020     /s/ *Elizabeth A. Preston Deavers*
ELIZABETH A. PRESTON DEAVERS
CHIEF UNITED STATES MAGISTRATE JUDGE